1  Katie M. Charleston (SBN 252422)
2  Katie Charleston Law, PC
   9151 Atlanta Avenue, No. 6427
3  Huntington Beach, CA  92615
   PH: 317-663-9190
4  Fax: 317-279-6258
5  Email: katie@katiecharlestonlaw.com

6

7  Attorney for Defendant, Demetrious Polychron

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                    **WESTERN DIVISION**

11  THE TOLKIEN TRUST and THE TOLKIEN      Case No.: 2:23-cv-04300-SVW(Ex)
    ESTATE LTD,
12

13
                                          **ANSWER TO PLAINTIFFS'**
14                    Plaintiffs,          **COMPLAINT**

15                                         **[JURY TRIAL DEMANDED]**

16       vs.

17

18

19  DEMETRIOUS POLYCHRON,

20                    Defendant.

21

22

23

24

25

26

27

28

                    **ANSWER TO PLAINTIFFS' COMPLAINT**

Defendant, Demetrious Polychron ("Defendant"), by counsel, responds to Plaintiffs' Complaint as follows:

## **INTRODUCTION**

1.      This action arises out of Defendant Demetrious Polychron's ("Polychron") willful and blatant violation of Plaintiffs' copyright interests in and to the highly acclaimed and internationally renowned *The Lord of the Rings* trilogy authored by Professor J.R.R. Tolkien, including *The Fellowship of the Ring, The Two Towers*, and *The Return of the King* (the "Tolkien Trilogy"), as well as other of Professor Tolkien's creative works (the "Tolkien Canon").

**ANSWER:** Defendant denies violation of Plaintiffs' copyright interests in any work.

2.      The Copyright Act encourages creativity by granting to the creator a bundle of rights that includes the right to prepare derivative works. U.S.C. §106. A "derivative work", as defined in §101, is a work "based upon one or more preexisting works", to include "any other form in which a work may be recast, transformed, or adapted."

**ANSWER:**  Defendant admits the allegations in paragraph 2.

3.      As the copyright owners, Professor Tolkien – and now, the Tolkien Estate – have the exclusive right to prepare, authorize, and/or restrict the preparation of derivative works based upon the Tolkien Canon, including the Tolkien Trilogy.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 3 and therefore denies same.

4.      Despite being fully aware of Plaintiffs' rights in and to the Tolkien Trilogy, Defendant nevertheless elected to write, publish, market and sell a blatantly infringing derivative sequel to the Tolkien Trilogy entitled *The Fellowship of the King* (the "Infringing Work").  In addition to clearly mimicking the title of the first book in the Tolkien Trilogy, the Infringing Work constitutes a blatant, wide-ranging and comprehensive misappropriation of Professor Tolkien's creative opus. It picks up two decades after the final scene in the Tolkien Trilogy, transposes Professor Tolkien's

**ANSWER TO PLAINTIFFS' COMPLAINT**

fictional universe into an unauthorized sequel by another author, and builds directly on the relationships, characters, and plot elements imagined by Professor Tolkien. Upon close review of its content, the Infringing Work also includes verbatim copying of prose as well as unauthorized exploitation of innumerable independently copyrightable characters, original settings, scenes and plots.

**ANSWER:** Defendant denies allegations in paragraph 4.

5. According to public statements by Defendant, the Infringing Work represents only the first in an infringing sequel series intended to comprise up to six additional derivative works, the second entitled *The Two Trees* (in clear and direct reference to the second book in the Tolkien Trilogy entitled *The Two Towers*), with the remaining six intended to continue to expand on Professor Tolkien's original work (the "Infringing Series").

**ANSWER:** Defendant admits in part he wrote a book series. Defendant denies the remaining allegations in paragraph 5.

6. The Infringing Work is currently being offered for sale on various online platforms in the United States for $17.99 - $26.99 a copy.

**ANSWER:** Defendant admits his work was offered for sale on various online platforms in the United States for $17.99 - $26.99, but denies that it is currently for sale.

7. Since its initial publication, J.R.R. Tolkien and later the Tolkien Estate have only authorized limited derivative works based upon the Tolkien Canon (including the Amazon Studios original series, *The Lord of the Rings: The Rings of Power* (the "Amazon Series")). Neither Professor Tolkien nor the Tolkien Estate has ever authorized any written sequels to the Tolkien Trilogy. Not only was the Infringing Work unauthorized, but the Tolkien Estate had already expressly refused the Defendant's request to publish any work of this nature, in keeping with its longstanding policy.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 7, and therefore denies the same.

**ANSWER TO PLAINTIFFS' COMPLAINT**

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

8.      Plaintiffs attempted to engage in substantive dialogue with Defendant prior to filing this lawsuit.  After Plaintiffs sent their first "cease and desist" letter, Defendant responded directly to Plaintiffs – without Plaintiffs' counsel on copy – with a diatribe that attempted to contextualize the creation of the Infringing Work as "loving homage" to Professor Tolkien, but expressly conceded that the Infringing Work is a sequel. *See* Exhibit A, at Page 2 ("it never occurred to me that everybody did not want and would not rejoice, if someone was actually able to successfully write a worthy sequel to "The Lord Of The Rings" … the most epic and beloved work I have ever read.").

**ANSWER:** Defendant admits in part that Plaintiffs and Defendant engaged in dialogue regarding Defendant's work.  Defendant denies all other allegations in Paragraph 8.

9.      Plaintiffs' counsel then made numerous attempts to schedule a call with Defendant to discuss discontinuing sales of the Infringing Work, but such calls were consistently delayed due to what Defendant claimed to be a serious illness.  Despite claims of being "floridly symptomatic with the flu" and bedridden on doctor's orders, Defendant was nevertheless well enough in the interim to seek, retain, and instruct counsel to file a frivolous lawsuit against Plaintiffs and other defendants for purported copyright infringement of Defendant's Infringing Work by the Amazon Series, which is currently pending before this court. *Polychron v. Bezos et al.*, 23-cv-02831-SVW-E (C.D. Cal. 2023).

**ANSWER:** Defendant admits that he was ill and unable to schedule a call with Plaintiffs' counsel and that he retained counsel to file an infringement lawsuit against the Plaintiffs, but denies all remaining allegations in Paragraph 9.

10.      In light of Defendant's flagrant behavior, the Tolkien Estate must of necessity bring this claim seeking redress for the unauthorized and unlawful publication and exploitation of the Infringing Work under the Copyright Act of 1976, 17 U.S.C. §§ 101 and 106.

**ANSWER TO PLAINTIFFS' COMPLAINT**

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 10, and therefore denies the same.

<u>**THE PARTIES**</u>

11.     The Tolkien Estate Limited is the legal body that holds and manages the intellectual property of the late Professor J.R.R. Tolkien, author of the internationally renowned Tolkien Trilogy as well as many other creative works of art and literature. Its principal place of business is Prama House, 267 Banbury Road, Oxford OX2 7HT, United Kingdom. The Tolkien Estate Limited is, and was at all times material herein, engaged in the business of managing and preserving the entirety of Professor Tolkien's literary and artistic legacy, including managing the copyrights in and to the works that make up the Tolkien Canon and licensing the rights to create derivative works based on the Tolkien Canon to third parties for authorized exploitation.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 11, and therefore denies the same.

12.     The Tolkien Trust is a charity, registered with the Charity Commission for England and Wales, and with a principal place of business at 267 Banbury Road, Oxford OX2 7HT, United Kingdom. It is a charitable company which makes grants to a wide range of causes, including those focused on alleviating poverty and social, educational and healthcare disadvantage, and on environmental concerns and the arts. The Tolkien Trust holds a beneficial ownership with respect to the copyright interests in the Tolkien Trilogy.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 12, and therefore denies the same.

13.     Upon information and belief, Demetrious Polychron is an author and resident of Los Angeles, California, who holds himself out as owner and publisher of Fractal Books, with its principal place of business at 2450 Colorado Avenue, Santa Monica, California, 90404. Defendant's books, including the Infringing Work, are available for sale on the "Fractal Books" website (https://www.fractalbooks.com/product/the-

fellowship-of-the-king/), as well as other online retail vendors and stores. Upon information and belief, "Fractal Books" is not a registered business entity in the State of California or elsewhere and is not registered as a Fictional Business Name in Los Angeles County or any neighboring county.

**ANSWER:** Defendant admits that he is an author and resident of Los Angeles and owner and publisher of Fractal Books, but denies that the alleged infringing work is still for sale or that his business is not a registered business and so denies the remaining allegations in Paragraph 13.

## JURISDICTION AND VENUE

14.   This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1338 because they arise under the Copyright Act.

**ANSWER:** Defendant admits the court has jurisdiction under the Copyright Act.

15.   Personal jurisdiction over Defendant is proper because Defendant is domiciled, and (to the extent relevant) his "Fractal Books" business is headquartered, in the State of California.

**ANSWER:** Defendant admits he is subject to personal jurisdiction in the State of California.

16.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 1400(a) as a substantial part of the events or omissions giving rise to the claim occurred, and the Defendant resides or may be found, in this judicial district.

**ANSWER:** Defendant admits venue is proper.

## STATEMENT OF FACTS

17.   The Tolkien Estate is the owner and copyright proprietor, as successor-in-interest, of the Tolkien Trilogy and the body of works comprising the Tolkien Canon. The Tolkien Trilogy comprises three original creative works of literature written by the late author Professor J.R.R. Tolkien: *The Fellowship of the Ring, The Two Towers*, and *The Return of the King*. Other important works in the Tolkien Canon that tell the story of Middle-earth are *The Hobbit* and *The Silmarillion*.

1    **ANSWER:** Defendant lacks knowledge or information sufficient to form a belief
2    as to the truth or falsity of the allegations in Paragraph 17, and therefore denies the same.

3    18.    The Tolkien Estate has been extremely selective in granting licenses to create
4    authorized derivatives in order to protect the integrity of the Tolkien Canon. As Professor
5    Tolkien himself elected never to publish a written sequel to the Tolkien Trilogy, the
6    Tolkien Estate has honored his legacy by generally refraining from granting or licensing
7    this right to third parties.  As such, the limited authorized derivative works that the
8    Tolkien Estate has authorized, such as the 2001-03 film series, the Amazon Series, and
9    various video games and other adaptations, have been carefully chosen by the Tolkien
10   Estate for the purpose of reaching new generations of fans worldwide and helping
11   maintain the enduring popularity of Tolkien's original literary works.

12   **ANSWER:** Defendant lacks knowledge or information sufficient to form a belief
13   as to the truth or falsity of the allegations in Paragraph 18, and therefore denies the same.

14   19.    It is difficult to overstate the cultural impact of the Tolkien Canon, and in
15   particular the Tolkien Trilogy, on modern literature and popular culture.  The Tolkien
16   Trilogy is an epic fantasy masterpiece and literary phenomenon.  It is widely regarded as
17   the greatest work of literary fantasy ever written.  It popularized an entire new genre of
18   literature and is studied extensively in academia.  Just as one measure of its importance,
19   as recently as 2019, a panel of writers, critics and curators sponsored by the BBC News
20   chose the Tolkien Trilogy as one of the 100 greatest books of all time.  Similar polls have
21   found the Tolkien Trilogy to be among the most popular and influential novels in the
22   English language.

23   **ANSWER:** Defendant lacks knowledge or information sufficient to form a belief
24   as to the truth or falsity of the allegations in Paragraph 19, and therefore denies the same.

25   20.    The Tolkien Trilogy tells the story of a fellowship of unlikely heroes in the
26   Tolkien-created universe of Middle-earth. Long ago, the Dark Lord Sauron forged a
27   "Ring of Power" to control Middle-earth, but the Ring was stolen and thought to be lost
28   forever. Many years later, the Ring ends up in the possession of an unassuming hobbit

named Bilbo Baggins, who bequeaths the ring to his young nephew, Frodo. Together with his friends Samwise Gamgee, Pippin Took, and Merry Brandybuck, Frodo must journey across Middle-earth to the only place the Ring can be destroyed, Mount Doom in Mordor, and to defeat Sauron.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 20, and therefore denies the same.

21.     Over the course of the Tolkien Trilogy, Frodo and his allies – hobbits Sam, Pippin and Merry; the wizard (or Maiar) Gandalf; the men Boromir and Aragorn; the elf Legolas; and the dwarf Gimli, accept the dangerous task of carrying the Ring back to Sauron's country. Together, they face a series of close calls and misadventures until finally succeeding in their perilous quest. Tolkien's Middle-earth is populated not only by humans, hobbits, Wizards, Elves and Dwarves, but also by Ents, Trolls, Orcs, Nazgûl, Balrogs, and Barrow-wights, and many other imagined beings, each of which have distinct physical characteristics, ancestral roots, dialects, legends, and habits that are typically described in great detail in the Tolkien Canon.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 21, and therefore denies the same.

22.     The history and chronology of Middle-earth is a creative magnum opus unto itself, spanning numerous ancient eras, mythologies, and destructions and rebirths of various civilizations across Professor Tolkien's fictional world. So expansive and elaborate is Middle-earth that Professor Tolkien's son, Christopher Tolkien, published a 12-volume series of books to collect and analyze his father's conception of Middle-earth and its various peoples, languages, and history, with each such volume comprising hundreds of pages.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 22, and therefore denies the same.

23.     The first book in the Tolkien Trilogy, *The Fellowship of the Ring*, was first published in 1954, followed that same year by *The Two Towers*, and followed shortly

thereafter in the following year by *The Return of the King*. Since the release of the first book in 1954, the Tolkien Trilogy has been a tremendous popular and critical success, estimated to have been translated into 57 languages and with over 150 million copies sold.

**ANSWER;** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 23, and therefore denies the same.

24.     The themes, plot, setting, characters, mood, pace, sequence of events, and dialogue in the Tolkien Trilogy are all Professor Tolkien's original creative work, the copyrights to which are now held by the Tolkien Estate. Plaintiffs hold valid and subsisting copyright interests in, and U.S copyright registrations for, the entire Tolkien Canon, including *The Hobbit* (Reg. No. TX 4-374-803); the three volumes comprising *The Tolkien Trilogy*, *i.e. The Fellowship of the Ring* (Reg. Nos. Ai 4273 and RE 121-069), *The Two Towers* (Reg. Nos. Ai 4465 and RE 121-070) and *The Return of the King* (Reg. No. TX 4-281-409); and *The Silmarillion* (Reg. Nos. AF 46501 and RE 961- 370).

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 24, and therefore denies the same.

25.     Upon information and belief, on or around 2017, Defendant Polychron began to create the Infringing Work and conceived of the Infringing Series.

**ANSWER:** Defendant denies the allegations in Paragraph 25.

26.     On or around November 21, 2017, Defendant sent a letter to the grandson of J.R.R. Tolkien, Simon Tolkien, expounding on his admiration for the Tolkien Trilogy and admitting that he had been writing an unauthorized sequel. *See* Nov. 21, 2017 letter to Simon Tolkien, attached hereto as Exhibit B. In this letter, Defendant states that he had read the Tolkien Trilogy repeatedly "until the spines gave out" and says that he has been "writing the obvious pitch-perfect sequel to 'The Lord of the Rings. I know I shouldn't have, but I really didn't have a choice." To do so, he explained that his goal was "to stick as close to canon as I could."

**ANSWER TO PLAINTIFFS' COMPLAINT**

1

2

**ANSWER:** Defendant denies that he admitted to writing an unauthorized sequel, but admits the remaining allegations.

3

4

5

6

7

8

27.    On or around November 7, 2019, Defendant retained counsel to contact Plaintiffs regarding a potential collaboration with him on the publication of such sequel. Plaintiffs replied by counsel that the Tolkien Estate did not wish to grant the rights to any third party to publish a sequel to the Tolkien Trilogy, noting that The Tolkien Estate had long maintained a policy of not licensing other writers to create sequels or extensions to Tolkien's famous works.

9

**ANSWER:** Defendant admits the allegations made in Paragraph 27.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

28.    Nevertheless, on or around December 24, 2019, Defendant sent a follow up letter to Simon Tolkien alongside a copy of the manuscript of the Infringing Work, stating: "When I first started writing, I had no plan nor any real knowledge of what I was getting myself into. I only knew that I loved this world and it seemed to me the Holy Grail of fantasy adventure; the thing that everyone wanted someone to do: to write the sequel to The Lord Of The Rings", [but] "now that it's written, I'm not sure what to do with it […] I have zero interest in infringing on your rights; the rights of the Estate, [but] I cannot conceive of deleting this manuscript." *See* December 24, 2019, letter to Simon Tolkien, attached hereto as Exhibit C.  Further, he wrote: "I truly cannot imagine, anyone else alive in the world who is capable of taking the foundation your grandfather wrote and expanding upon it as beautifully and imaginatively as I have […] I know it is conceivable to change all the names and publish these books by myself as something else[…]", however, "[i]t almost feels like a death. I do not have it in me to do that." Simon Tolkien did not read the manuscript and instead mailed it back to Defendant in a self-addressed stamped envelope which the Defendant had provided.

25

26

27

28

**ANSWER:** Defendant admits in part to writing and delivering the letter and to the contents of the letter, but lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 28, and therefore denies the same.

**ANSWER TO PLAINTIFFS' COMPLAINT**

29.     On information and belief, and despite his declared aversion to infringing the rights of the Estate, Defendant nevertheless began selling and advertising for sale the Infringing Work on the "Fractal Books" website and other online platforms.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 29, and therefore denies the same.

30.     Plaintiffs first learned that the Infringing Work was being offered for sale on the "Fractal Books" website on March 7, 2023. The promotional copy for the Infringing Work makes clear that the work is a derivative sequel purporting to pick up after the events of *The Fellowship of the Ring*, stating in part:

> *Elanor, daughter of Samwise, is nervous the night before her debutante party in the Shire. In the 22nd year of the reign of the High King Elessar the Blue Wizards return from out of the East bearing perilous news: the rest of the Rings of Power have been found and they are in deadly danger. Thus begins the War of the Rings to End All Wars of the Rings. Before it is over Elves, Hobbits, Dwarves, Men and magical races long forgotten or never seen before will join the Quest for Celebrimbor's originals and the last of Sauron's corrupted Rings of Power.*

Samwise Gamgee is one of the major protagonists in the Tolkien Trilogy, as is High King Elessar (also known as Aragorn or Strider). Both are fully realized (and beloved) literary characters fleshed out by Professor Tolkien in great detail through descriptions, dialogue and action. Sauron, the primary antagonist in the Tolkien Trilogy, is also drawn in extensive detail. Celebrimbor, too, is a major character within the Tolkien Canon. With respect to Elanor, the main protagonist in the Infringing Work, at the close of the third book in the Tolkien Trilogy, *The Return of the King*, Professor Tolkien describes Samwise returning home to Bag End to his wife and daughter: "And Rose drew him in,

1
2
3

and set him in his chair, and put little Elanor upon his lap. And he drew a deep breath. 'Well, I'm back,' he said." The Infringing Work simply picks up two decades after this scene, making it the very definition of a sequel.

4
5

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 30, and therefore denies the same.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

31.     A review of the Infringing Work in full demonstrates that Defendant's own descriptions of his novel are entirely accurate: the novel is without question an unauthorized sequel. Moreover, the extent of copying found in the Infringing Work is nothing short of egregious, as it incorporates an astonishingly wide range of copyright-protected elements from the Tolkien Canon. These include, but are not limited to: verbatim copying of at least 15 poems or other passages from the Tolkien Trilogy; the use of Middle-earth and dozens of settings described in detail in the Tolkien Trilogy as settings in which scenes in the Infringing Work take place; inclusion of *hundreds* of original and distinctive characters from the Tolkien Trilogy including major characters that are central to the story being told such as Samwise, Aragorn, Arwen, Tom Bombadil, Goldberry, Legolas, Gimli, Treebeard, Galadriel, Elrond, and others; inclusion of new characters that are barely-disguised versions of Professor Tolkien's characters, such as the wizard Alatar (a character Professor Tolkien introduced and described as a Blue Wizard, and whom Defendant has adapted into a stand-in for Gandalf); and a recycling of the entire plot premise of the Tolkien Trilogy, such as a coming of age event at Bag End that is interrupted by news of yet another powerful ring, causing a group of hobbits to flee for their lives and then undertake a perilous journey across Middle-earth with a band of diverse allied beings to end the threat of the rings, visiting many of the key locations described in the Tolkien Trilogy. Without question, the total concept and feel of the works is substantially similar.

26
27

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 31, and therefore denies the same.

28

ANSWER TO PLAINTIFFS' COMPLAINT

1

2    32.    A non-exhaustive summary of the substantial similarities in creative

3    expression as between the respective works based upon a review of the manuscript of the

4    Infringing Work include:

5        a.    PLOT, SCENES, AND SEQUENCE OF EVENTS

6        **ANSWER:** Defendant lacks knowledge or information sufficient to form a belief

7    as to the truth or falsity of the allegations in Paragraph 32, and therefore denies the same.

8        33.    The plot of the Tolkien Trilogy follows a group of reluctant heroes from the

9    fantasy world of Middle-earth in a war against the Dark Lord Sauron. Just to recap the

10   first portion of *The Fellowship of the Ring* (the first book in the Tolkien Trilogy), on the

11   eve of his thirty-third birthday in the Shire, his "coming of age" date, Frodo is gifted an

12   ancient Ring, thought lost for centuries, that is in fact the ruling ring of the Dark Lord

13   Sauron. Frodo later flees his home at Bag End in Hobbiton, prompted by the wizard

14   Gandalf who reveals that the Ring is being hunted by nine Nazgûl (Ring-Wraiths), and

15   Frodo initially is joined by his hobbit friends Samwise Gamgee, Pippin, and Merry. At

16   one point, the hobbits take a short cut through the Old Forest, where Frodo is saved from

17   a living tree by the ancient and enigmatic Tom Bombadil, and the hobbits spend time in

18   his home, which he shares with his wife Goldberry. Before they leave, Tom teaches them

19   a rhyme that they can use to summon him if they are in danger (and which they use soon

20   thereafter when trapped by a malevolent spirit). Later, the hobbits arrive at the town of

21   Bree, and lodge at The Prancing Pony, an inn tended by owner Barliman Butterbur. There

22   they meet a "strange-looking weather-beaten man" in a "travel-stained cloak" that is later

23   revealed to be the future king, Aragorn, who helps them escape Bree when the evil forces

24   attack. After another encounter with the Nazgûl at the hill called Weathertop, where

25   Frodo is wounded by a cursed blade, the companions must race to reach the shelter of

26   Rivendell, presided over by Elrond, where the "Fellowship of the Ring" will assemble to

27   take the One Ring to Mordor to destroy it.

28       **ANSWER:** Defendant lacks knowledge or information sufficient to form a belief

as to the truth or falsity of the allegations in Paragraph 33, and therefore denies the same.

**ANSWER TO PLAINTIFFS' COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

34.     The plot of the Infringing Work follows Samwise Gamgee as well as his oldest daughter Elanor, first introduced by Professor Tolkien in the last chapter of the Tolkien Trilogy, with additional information about her provided in an appendix. Here, too, on the eve of a poignant birthday (Elanor's society debut), a wizard, Alatar, comes to the Shire. Alatar is one of the brethren of Gandalf and is in dire need of hobbit assistance as the existence of more rings of power has been brought to light, and which place Middle-earth in great danger. In a scene derivative of Gandalf's visit to Frodo at the start of the Tolkien Trilogy, Alatar recruits a reluctant Sam and his wife Rosie to help, but Elanor too impulsively decides to assist, leading to two groups of hobbits fleeing the Shire – Sam and his wife Rosie in one group, and Elanor and two friends in the other group. Sam and Rosie are chased by "Orcelven" (an apparent combination of two of Professor Tolkien's created races: Orcs and Elves) on the road and flee into the Old Forest, where they are saved from a confrontation with the Orcelven leader by Tom Bombadil after Rosie chants the summoning rhyme from Professor Tolkien's work; Sam and Rosie then spend the night with Bombadil and Goldberry before eventually making their way to Bree, where they rejoin Elanor, Alatar and Elanor's friends. Elanor and her friends – staying at The Prancing Pony and attended by Barliman Butterbur – have now made the acquaintance of a mysterious "grim young man in a long grey cloak," who turns out to be Crown Prince Eldarion, Aragorn's son. In a scene almost identical to the scene in the Tolkien Trilogy in which the hobbits meet Aragorn, Eldarion confides in them and then forms a "Fellowship of the King" with the goal of gathering the remaining rings and using them to defeat the enemy. (Later, a new group of nine Nazgûl, created by a corrupted Elf, Glorfindel, attack Elrond's sons at Weathertop.)

**ANSWER:** Defendant denies the allegations in paragraph 34.

35.     In addition to this remarkable duplication of central plot and structure just in the first 70 pages of the Infringing Work, there are many other duplicative and derivative plotlines and scenes throughout Defendant's novel, too many to catalog here. Perhaps most glaringly, throughout the book Defendant simply repeats narratives set forth in the

**ANSWER TO PLAINTIFFS' COMPLAINT**

Tolkien Trilogy and other portions of the Tolkien Canon, paraphrasing the original stories and in some cases tweaking them for his own purposes. For example, Defendant expansively repeats the narrative in the last chapter of the Tolkien Trilogy ("The Grey Havens"); repeats the stories of the flight to the Ford of Bruinen and the destruction of the One Ring (and other plot points from the Tolkien Trilogy) from the perspective of Glorfindel; and retells substantial portions of Professor Tolkien's stories from the Second Age of Middle-earth concerning Galadriel, Aldarion, Gil-Galad, Celebrimbor, Elrond and others. In countless other instances, Defendant recaps portions of narratives from the Tolkien Canon.

**ANSWER:** Defendant denies the allegations in Paragraph 35.

b.      SETTINGS

36.     The works in the Tolkien Canon, including the Tolkien Trilogy, are set on Arda, an imagined version of Earth originally containing several continents including Aman, Middle-earth and Numenor. Most of the works in the Tolkien Canon, such as *The Hobbit* and the Tolkien Trilogy, are set in the Third Age, after Aman was removed from Arda and Numenor was destroyed, and thus such works generally take place on Middle-earth; however, some narratives are set in the Second Age, in a 3,441-year period during which the civilization of Numenor rises and falls, and the Dark Lord Sauron tricks the Elves into creating the Rings of Power. Sauron is defeated for the first time at the end of the Second Age, and the Third Age culminates in Sauron's rise and final defeat with the destruction of the One Ring. After Sauron's defeat, Aragorn is crowned as King Elessar.

**ANSWER:** Defendant denies the allegations in paragraph 36.

37.     Locations in Middle-earth are brought to life through maps and storytelling in the Tolkien Canon, with hundreds of locales described in exquisite detail. In the first novel in the trilogy, *The Fellowship of the Ring*, the narrative is focused on the northwestern portion of Middle-earth, specifically the region stretching from the Shire to Rivendell at the edge of the Misty Mountains, all within the region of Eriador in the Kingdom of Arnor. The action then shifts to the Fellowship's trek through and under the

ANSWER TO PLAINTIFFS' COMPLAINT

Misty Mountains and to Lothlorien, and down the River Anduin. Professor Tolkien crafted his descriptions of the Shire in particular with great care, the details of which (including its history and geography) are found not just in the text, but in extensive appendices. The home of Bilbo and Frodo Baggins, and later Samwise Gamgee, at Bag End, is described in loving detail across *The Hobbit* and the Tolkien Trilogy, as are the rolling hills and fields of the surrounding countryside, the nearby Old Forest, the house of Tom Bombadil, the village of Bree and its inn, The Prancing Pony. From Bree, the hobbits travel through the Midgewater Marshes to Weathertop, where they are attacked; from there, they take the East Road and cross the Last Bridge, before Frodo's mad race with Glorfindel to the Ford of Bruinen, and the Hobbits' entrance into Rivendell. Even locations that do not play a major role in the primary narratives of *The Hobbit* and the Tolkien Trilogy often are described with some detail either in the text of those works or elsewhere in the Tolkien Canon, and the whole of Middle-earth is described in Professor Tolkien's maps.

**ANSWER:** Defendant denies the allegations in paragraph 37.

38.     The Infringing Work is set in the same Middle-earth. It picks up in The Shire, in Hobbiton and specifically at Bag End two decades following the events of the Tolkien Trilogy saga, in the 22nd year of the reign of the High King Elessar. The main action proceeds to the countryside east of Hobbiton, then through the Old Forest (and Tom Bombadil's home there) and on to the village of Bree and The Prancing Pony. Major events occur at Weathertop and in Rivendell. Moreover, over the course of the Infringing Work, Defendant sets action in, or at least mentions literally hundreds of settings from The Tolkien Trilogy, in order to firmly place his narrative within the fictional universe created by Professor Tolkien. In the first two paragraphs of the Infringing Work alone, he mentions the Shire, Hobbiton, Bucklebury, Tuckborough, the Four Farthings, Bag End, Bree, Arnor, Gondor, Tookland, Buckland, and the Brandywine Bridge. This is but the tip of the iceberg, as the entirety of the Infringing Novel traverses a substantial portion

of the geography and history of Middle-earth and other settings crafted by Professor Tolkien.

**ANSWER:** Defendant denies the allegations in paragraph 38.

39.     Moreover, Defendant's derivative version of Middle-earth lacks the deeply detailed descriptive language of the original that helped make the Tolkien Trilogy the revered classic that it is today. Small wonder: He simply provides bare sketches of the descriptions already created by Professor Tolkien and asks his readers to infer the breadth of Tolkien's creations just by virtue of naming them. When Defendant does describe a setting, he often just mimics Tolkien's own language or makes a minimal effort to tweak it. As examples, when he first describes the garden at Bag End, he writes: "Late afternoon sunshine flooded the meadows of the Hill with a pleasant glow. Bright blossoming snap-dragons, sunflowers and nasturtiums filled the open fields and covered the green turf walls of Bag End." Compare this to the original in Professor Tolkien's *The Fellowship of the Ring*, where Professor Tolkien writes: "The late afternoon was bright and peaceful. The flowers glowed red and golden: snap-dragons and sunflowers, and nasturtiums trailing all over the turf walls and peeping in at the round windows."

**ANSWER:** Defendant denies the allegations in paragraph 39.

40.     As another example, while Professor Tolkien provides multiple descriptions of the countryside between Hobbiton and Bree, Defendant offers simplistic, skeletal versions and again relies on the reader's familiarity with Professor Tolkien's work to help call to mind richer, more complete settings: "They crossed the Brandywine Bridge and reached the threefold split in the King's Road, where the East Road continued to Bree. The High Hay Parkway crossed it going south, following The Hedge. This marked the border between Buckland and the Old Forest. The Buckland Highway wound south towards Brandy Hall, Crickhollow, Bucklebury and Standelf." As Sam and Rosie near the Old Forest, the woods are described in the barest of terms drawing on Tolkien's underlying works: "Beyond the fields to the south, the edge of trees grew thicker and darker, marking the entrance to the Old Forest."; "The dark eaves of the Old Forest rose

like sentinels before them."; and "When they reached the top of the hill, a low valley opened before them." Inside the Old Forest, Defendant's descriptions remain minimal and wholly derivative: "They galloped through the narrowing gaps between trees and rode deeper into the forest, passing many a moonlit grove." As Sam and Rosie approach Tom Bombadil's house, Defendant includes a bit more detail (but, as shown below, only by paraphrasing the original): "In time, a mist rose up about them and the sounds of gurgling streams came closer. Reaching a low waterfall, it poured down over close-fitted flag stones set just above the waterline. They rode over the tops and came to a field of grass grown short, as if it had been mowed. The hedges along their upward sloping path grew into themselves as if clipped. It led up a gently sloping hill and ended at a grassy knoll."

**ANSWER:** Defendant denies the allegations in paragraph 40.

41.    In *The Fellowship of the Ring*, by contrast, the Old Forest is first described at some length by the character Merry. Then, as the hobbits approach the Old Forest, Professor Tolkien describes it in detail: "The hobbits now left the tunnelgate and rode across the wide hollow. On the far side was a faint path leading up on to the floor of the Forest, a hundred yards and more beyond the Hedge; but it vanished as soon as it brought them under the trees. Looking back they could see the dark line of the Hedge through the stems of trees that were already thick about them. Looking ahead they could see only tree-trunks of innumerable sizes and shapes: straight or bent, twisted, leaning, squat or slender, smooth or gnarled and branched; and all the stems were green or grey with moss and slimy, shaggy growths." The description continues, highlighting the forest's potential danger: "They picked a way among the trees, and their ponies plodded along, carefully avoiding the many writhing and interlacing roots. There was no undergrowth. The ground was rising steadily, and as they went forward it seemed that the trees became taller, darker, and thicker. There was no sound, except an occasional drip of moisture falling through the still leaves. For the moment there was no whispering or movement among the branches; but they all got an uncomfortable feeling that they were being watched with

disapproval, deepening to dislike and even enmity." Finally, Professor Tolkien describes the approach to Tom Bombadil's house: "Just as they felt their feet slowing down to a standstill, they noticed that the ground was gently rising. The water began to murmur. In the darkness they caught the white glimmer of foam, where the river flowed over a short fall. Then suddenly the trees came to an end and the mists were left behind. They stepped out from the Forest and found a wide sweep of grass welling up before them. The river, now small and swift, was leaping merrily down to meet them, glinting here and there in the light of the stars, which were already shining in the sky. The grass under their feet was smooth and short, as if it had been mown or shaven. The eaves of the Forest behind were clipped, and trim as a hedge.  The path was now plain before them, well-tended and bordered with stone. It wound up on to the top of a grassy knoll, now grey under the pale starry night; and there, still high above them on a further slope, they saw the twinkling lights of a house.  Down again the path went, and then up again, up a long smooth hillside of turf, towards the light."

 **ANSWER:**  Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 41, and therefore denies the same.

42.    Defendant's slavish reliance on Tolkien's descriptions, and the limited nature of his own, serve to highlight the entirely derivative nature of the Infringing Work.

 **ANSWER:**  Defendant denies the allegations in Paragraph 42.

43.    Many of the main characters in the Tolkien Canon are so carefully drawn and fully realized that they are subject to independent copyright protection under applicable law.  Characters such as Samwise Gamgee, Goldberry and Tom Bombadil, Aragorn and Arwen, Legolas and Gimli, Galadriel, Barliman Butturbur, Elrond, Sauron and others are given distinctive physical as well as conceptual qualities; are sufficiently delineated to be recognizable as the same characters wherever  they appear and display consistent, identifiable character traits and attributes; and are especially distinctive and contain some unique elements of expression.  Indeed, Professor Tolkien's main characters have become some of the most cherished characters in literature, precisely because of the author's great

skill in bringing his characters to vivid life, complete with complex backstories and motivation.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 43, and therefore denies the same.

44.     The lead characters of the Infringing Work are either lifted entirely from the Tolkien Trilogy or fleshed out from characters identified in the Tolkien Trilogy as the next generation of hobbits and humans. Characters such as such as Samwise and Rosie Gamgee, Goldberry and Tom Bombadil, Aragorn and Arwen, Legolas and Gimli, Elassar, Galadriel, Barliman Butterbur, Elrond, Sauron and others are literally the same as those in the Tolkien Trilogy and appropriated in their entirety in the Infringing Work. Defendant again relies on the reader's familiarity with these fully rendered characters from Professor Tolkien's works, or at most provides nominal, derivative descriptions of his own.

**ANSWER:** Defendant denies the allegations in Paragraph 44.

45.     For example, the character Samwise Gamgee is one of the main protagonists in the Tolkien Trilogy, and one of the main protagonists in the Infringing Work. Samwise, as portrayed by Professor Tolkien, is the amalgamation of hundreds of pages of dialogue, action, and physical description; he progresses from a mere gardener and friend of Frodo to a celebrated hero, all without sacrificing his humility and love for the quiet life in The Shire. Over and over again in his Infringing Work, Defendant revisits Sam's prior narratives from the Tolkien Trilogy, beginning with having Sam and his family living in Bag End as Professor Tolkien described occurring at the end of the Tolkien Trilogy. But further examples abound.  For instance, one character describes Sam's role in Middle-earth history, which summarizes the climactic sequent in the trilogy: "But in Mordor where the corrupting power of the evil spell Sauron wove was at its peak, Sam had the Ring on his finger and he transcended even that. Our histories teach he displayed this selflessness long before and consistently." Or, in Sam's own words in the Infringing Work: "Frodo and me, we cheated death on our way to Mount Doom a dozen times" and

"[i]t was [Gwaihir] who carried me, with Gandalf on his back. He may have been after Mr. Frodo, but it was me he grabbed. It was me he carried off the volcano." This is true for all of the main characters borrowed from the Tolkien Canon – even where Defendant does not re-describe them physically, he lifts their fictional stories from the underlying works and refers to those narratives freely throughout his derivative work.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 45, and therefore denies the same.

46. Further, Defendant takes ***hundreds*** of other characters from the Tolkien Canon, including the Tolkien Trilogy, and populates his Infringing Work with them. In the four-page prologue alone, Defendant mentions nearly 40 characters from the Tolkien Canon. Some of these characters, such as Celebrimbor and Aldarion, have extensive backstories in Professor Tolkien's works. Some, such as Elanor, Theo, Fastred and Eldarion are characters invented by Professor Tolkien as the children of main characters from the Tolkien Trilogy, whose life stories are provided in the Tolkien Trilogy's appendices in summary form (although as noted Elanor appears as an infant in the main text). Defendant merely plucks these character names and their stories from Professor Tolkien's text and sets them in motion in his infringing sequel.

**ANSWER:** Defendant denies the allegations in Paragraph 46.

47. The Tolkien Trilogy, set at the end of the Third Age of Middle-earth and at the dawn of the Fourth Age, is an epic adventure that contains a palpable, constant element of fear and suspense, as the heroes face many perils and must battle through them using their wits, their respective strengths and talents, and their fierce determination to succeed for the greater good. Yet the novels are also pervaded with a sense of wistfulness and melancholy, as many characters are aware that their roles in Middle-earth are concluding, and that no matter the outcome of the war, momentous changes are coming. As the Fellowship crosses the various lands of Middle-earth, there is a deep sense of the past being present, with the weight of thousands of years of history making itself felt in the locations and through the experiences of the long-lived races that populate the

fictional world. However, the Tolkien Trilogy also contains a strong, and eventually triumphant, strain of hopefulness that leads to the promise of the new Age.  In all, the novels move at a fairly rapid pace in the manner of an adventure quest, with action sequences occurring throughout, with the characters having breaks for rest along the way, although these decrease as the Tolkien Trilogy nears its climax and the stakes become most dire.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 47, and therefore denies the same.

48.    The Infringing Work nominally is set at the beginning of the Fourth Age, but the mood is little different, if at all, from the mood in the Tolkien Trilogy, due primarily to the fact that Defendant essentially recreates many of the key plot points and gives the heroes a similar task.  Rather than spending much time envisioning the new Age, Defendant reverts to the same mood of nostalgia as in the Tolkien Trilogy, especially as the Infringing Work features Middle-earth beings associated more with earlier Ages, such as elves and wizards, in central roles.  The Infringing Work also aspires to be an epic adventure, such that is has a similar sense of peril and suspense, and moves at a similarly rapid pace as compared with the Tolkien Trilogy (with the exception that the Infringing Work contains long stretches of narrative exposition delivered by characters that – likely unintentionally – create awkward breaks in the pace and suspense of the proceedings).

**ANSWER:** Defendant denies the allegations in Paragraph 48.

49.    Some of the core themes expressed in the works in the Tolkien Canon, and especially the Tolkien Trilogy, include the triumph of good over evil; the acts of creation and destruction; the corrupting influence of power; "the ennoblement of the ignoble" (Professor Tolkien's phrase); the strength of friendship; the cyclical nature of history; and the rise of industrialization and the loss of man's connection to the natural world.  These are expressed in concrete ways through, for instance, the forging of the nine rings and One Ring, and the later destruction of the One Ring and its corrupting power, along with Sauron and his minions; the elevation of humble hobbits to the role of heroes; the bonds

**ANSWER TO PLAINTIFFS' COMPLAINT**

of the Fellowship; the revitalization of Sauron after his defeat in the Second Age; and the desecration of Fangorn Forest, Isengard and later The Shire by Saruman in the service of his own interests and creation of the machines of war.  Professor Tolkien memorably describes the defilement of Isengard:  "Once it had been green and filled with avenues, and groves of fruitful trees, watered by streams that flowed from the mountains to a lake. But no green thing grew there in the latter days of Saruman. The roads were paved with stone- the ignoble" (Professor Tolkien's phrase); the strength of friendship; the cyclical nature of history; and the rise of industrialization and the loss of man's connection to the natural world.  These are expressed in concrete ways through, for instance, the forging of the nine rings and One Ring, and the later destruction of the One Ring and its corrupting power, along with Sauron and his minions; the elevation of humble hobbits to the role of heroes; the bonds of the Fellowship; the revitalization of Sauron after his defeat in the Second Age; and the desecration of Fangorn Forest, Isengard and later The Shire by Saruman in the service of his own interests and creation of the machines of war.  Professor Tolkien memorably describes the defilement of Isengard:  "Once it had been green and filled with avenues, and groves of fruitful trees, watered by streams that flowed from the mountains to a lake. But no green thing grew there in the latter days of Saruman. The roads were paved with stone- flags, dark and hard . . . . Many houses there were, chambers, halls, and passages, cut and tunnelled back into the walls upon their inner side, so that all the open circle was overlooked by countless windows and dark doors. Thousands could dwell there, workers, servants, slaves, and warriors with great store of arms; wolves were fed and stabled in deep dens beneath. The plain, too, was bored and delved. Shafts were driven deep into the ground; their upper ends were covered by low mounds and domes of stone, so that in the moonlight the Ring of Isengard looked like a graveyard of unquiet dead. For the ground trembled. The shafts ran down by many slopes and spiral stairs to caverns far under; there Saruman had treasuries, store-houses, armouries, smithies, and great furnaces. Iron wheels revolved there endlessly, and

**ANSWER TO PLAINTIFFS' COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

hammers thudded. At night plumes of vapour steamed from the vents, lit from beneath with red light, or blue, or venomous green."

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 49, and therefore denies the same.

50.     As the Infringing Work is set fully in Professor Tolkien's fictional universe, it repeats many of these same themes and their unique expression by Professor Tolkien. The book revolves around a new fellowship of hobbit and human friends of somewhat humble origins who rise from their quiet lives to overcome evil.  The creation and destruction of rings of power, and their corrupting influence, again take a central place in the Infringing Work, and lead to the destruction or desecration of key locations from the Tolkien Trilogy such as The Prancing Pony and Rivendell. With respect to Rivendell, the Infringing Work explains its desecration in a manner that imitates, inartfully, Professor Tolkien's more fulsome descriptions: "Most of the forests and trees had been felled. What were once open fields full of wildflowers were now croplands under plow. Roads and bridges filled the valley floor, connecting the segmented and fenced parcels. A small city had been built of hastily assembled and ugly wooden barracks. There were kitchens, stables, latrines, armories, forges, training grounds and many more buildings: everything a great army of Men needed to become a marauding force of conquerors. Their refuse polluted the land. Gone were the pristine forests of what had once been one of the fairest places in Middle-earth."

**ANSWER:** Defendant denies the allegations in Paragraph 50.

51.     By virtue of retelling a similar story beginning with hobbits fleeing Bag End and following a similar path as in the Tolkien Trilogy, Defendant also (perhaps unwittingly, and not in the way Professor Tolkien likely would have intended) creates the appearance of a cyclical history.

**ANSWER:** Defendant denies the allegations in Paragraph 51.

52.     On Page vi of the Infringing Work, Defendant lists 17 passages and quotations lifted directly from the Tolkien Canon, although the author of two of those

**ANSWER TO PLAINTIFFS' COMPLAINT**

passages is listed as "Tolkien/Polychron," apparently in reference to the fact that the passage is an altered version of the original. These lifted passages total over 1400 words, by Defendant's own count.

**ANSWER:** Defendant admits he quoted Tolkien in his work and denies the remaining allegations in Paragraph 52.

53.    Defendant even repurposes chapter titles from the Tolkien Trilogy for many of his chapter titles, with slight alterations. Thus Professor Tolkien's chapter entitled "A Long-Expected Party" becomes, in the Infringing Work, "The Night Before A Party"; "The Shadow of the Past" becomes "The Shadow Of The Future"; "The Breaking of the Fellowship" becomes "The Sundering Of The Gardeners"; "The Road to Isengard" becomes "On The Road To Gondor"; "The Grey Havens" becomes "Betrayal At The Havens; "At the Sign of The Prancing Pony" becomes "The Fall Of The Prancing Pony"; "The Riders of Rohan" becomes "The Daughters of Rohan"; "The Council of Elrond" becomes "The Council Of Glorfindel"; and "Many Meetings" becomes "An Unexpected Meeting" (or "Secret Meetings", another chapter in the Infringing Work).

**ANSWER:** Defendant denies the allegations in Paragraph 53.

54.    Finally, Defendant also copies or paraphrases other language from the Tolkien Canon. For example, a well-known and beloved moment in The Hobbit occurs when Bilbo, at the end of the Battle of the Five Armies, sees the giant eagles approaching: *"The Eagles! The Eagles"* he shouted. *"The Eagles are coming!"* Later, in the third novel of the Tolkien Trilogy, *The Return of the King*, Gandalf picks up this same refrain when the eagles arrive at the conclusive battle against Sauron. In the Infringing Work, it is a Tower guard who repeats this line verbatim. Defendant also has incorporated other unique phrasings and language from Professor Tolkien into the Infringing Work, for example "the scouring of the Shire" and "thrice worthy and beloved Barliman" (in the Infringing Work altered to "thrice noble Barliman"). Again, these are but examples of such verbatim and paraphrased uses.

**ANSWER:** Defendant denies the allegations in Paragraph 54.

ANSWER TO PLAINTIFFS' COMPLAINT

25

55.     Defendant has publicly conceded these similarities in marketing materials for his Infringing Work, such as where he states that "the canon of the Legendarium has been scrupulously followed" and that elements of his book are "indistinguishable in origin and spirit from the originals."   *See* https://www.fractalbooks.com/story/story-behind-the-book-the-fellowship-of-the-king/

**ANSWER:** Defendant denies the allegations in Paragraph 55.

56.     Reviews of the Infringing Work on online retailer sites also make clear that readers recognize that the Infringing Work is an unauthorized derivative work.   *See* https://www.goodreads.com/en/book/show/78667911#CommunityReviews   (first three reviews below) and https://www.barnesandnoble.com/w/the-fellowship-of-the-king-demetrious-polychron/1142895065 (last two reviews below):

- *I read a part of the preview on Amazon before it was taken down, and for those of you who are curious, this book atrocity of a fanfic basically copies the LotR books sentence for sentence (e.g. fitting Bilbo's birthday party in FotR as "Elanor's debutante party"). I don't think Demetrious Polychron would be a terrible writer in all situations, but in this situation, when he is literally copying entire characters, plots, and worldbuilding from Tolkien, it is truly awful.*

- *This is literally bad LOTR fanfiction that you are trying to profit off of. Have some originality, mate. Hope you're gonna have enough money to cover the cost of all those lawsuits you're gonna be embroiled in.*

- *Got to love plagiarized work that is turned into a book to profit off of someone else's hard work \*sarcasm\**

- *Derivative fanfic garbage – an unauthorized "sequel" to Lord of the Rings that the author would have you believe is an original work. It's not. It's junk.*

- *All of the material has been lifted from Tolkien or other writers and has been slightly modified, in the laziest way possible. The book is also just terrible.*

- *A friend of mine lent me this book to see what I thought about it as a lifetime Tolkien fan. I had to put it down but I did skim the rest of the book. A lot of the characters are straight from Tolkien's Middle Earth with minor changes and some of the details are from several other fantasy writers. I was not impressed at all, and I cannot recommend this in good faith.*

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 56, and therefore denies the same.

57.    In light of the above, there is no question that the Infringing Work constitutes an unauthorized and blatantly infringing derivative sequel to the Tolkien Trilogy that also copies protectable elements from other works in the Tolkien Canon such as *The Hobbit* and *The Silmarillion*, both in content and by Defendant's own admission.

**ANSWER:** Defendant denies all allegations in Paragraph 57.

58.    As a result, on March 14, Plaintiffs asked their U.S. counsel to write a cease and desist letter to Defendant, notifying Defendant that the Infringing Work was in clear violation of Plaintiffs' rights and requiring that Defendant, *inter alia*, immediately remove the Infringing Work from his website, Fractal Books; that he immediately cause the Infringing Work to be removed from other third party retailers where it was available for sale or dissemination; and that he permanently destroy all copies of the Infringing Work, including the unpublished works in the Infringing Series.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 58, and therefore denies the same.

59.    On March 15, Defendant affirmed that he had received the cease-and-desist letter and would provide a substantive response by March 21.

**ANSWER:** Defendant admits he affirmed receipt of Plaintiff's cease and desist Letter and denies the remaining allegations in Paragraph 59.

60.    On March 21, Defendant sent a 5,000-word email to officers of The Tolkien Estate Limited and The Tolkien Trust, omitting Plaintiffs' counsel. The letter, attached hereto as Exhibit A, denies that the creation of the Infringing Work was "copyright

infringement" and instead recasts his efforts as a "loving homage" to Professor Tolkien. "Although many have tried in the past to write sequels to Tolkien's work", he writes, "[n]one of them come anywhere near to sticking as closely as I have to Canon while successfully writing an epic and entertaining story." In that same letter, he refers to his "imaginative expansion of your IP."  He also offers that Tolkien Estate can "retake control of JRRT's IP across every medium with [*the Infringing Work*] 'The War Of The Rings.'", and that "Discovery/Warner-Brothers will be offering to pay you *billions* to begin film production" if only Plaintiffs were to "accept the blessings of TWOTR in the spirit it was conceived."

**ANSWER:** Defendant admits that he sent the letter attached as Exhibit A, but denies the remaining allegations as phrased.

61.    On March 30, counsel for the Tolkien Estate wrote again to Defendant, reiterating that it is the Estate's longstanding policy not to entertain requests to create sequels to the Tolkien Trilogy.  Counsel appealed to Defendant as a supporter of Professor Tolkien and the Tolkien Trilogy to cease commercialization of the unauthorized sequel as a first step towards respecting the wishes of the Tolkien Estate. In an effort to avoid more formal action, counsel for Plaintiffs proposed a call to discuss the matter.

**ANSWER:**  Defendant admits the allegations in paragraph 61.

62.    Over the next ten days, counsel for Plaintiffs tried repeatedly to schedule a call with Defendant to resolve the dispute. Repeatedly, Defendant cancelled or postponed such calls, claiming that he was suffering from a serious illness, was bedridden on doctor's orders, and was physically unable to communicate. The latest of these efforts was on April 14, when Defendant cancelled the scheduled call with notification to Plaintiffs' counsel that he was in a "significant amount of pain" and unable to speak.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 62, and therefore denies the same.

**ANSWER TO PLAINTIFFS' COMPLAINT**

63.     Plaintiffs were therefore surprised to discover that, on the same day Defendant claimed to be  physically incapable of correspondence, Defendant had in fact filed a lawsuit in this District Court against the Tolkien Estate and others alleging that the parties had infringed *Defendant's* purported copyright in and to the Infringing Work in connection with the authorized derivative of the Amazon Series, and claiming damages in the amount of $250,000,000.  *See Polychron v. Bezos, at al*., 23-cv-02831 (C.D. Cal. 2023).

**ANSWER:** Defendant admits to filing the lawsuit *Polychron v. Bezos, et al*., 23-cv-02831 (C.D. Cal. 2023), but Defendant lacks sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations and denies same.

64.     On April 25, 2023, counsel for the Tolkien Estate sent Defendant's counsel a communication reiterating the Tolkien Estate's demands set forth in the March 14, 2023 letter, and noting that the lawsuit that Defendant had filed was frivolous, in particular because "[i]t is well settled that unauthorized derivative works are not afforded any copyright protection, because they unlawfully infringe the exclusive rights of the original author," *citing* 17 U.S.C. § 106 and *Anderson v. Stallone*, 1989 WL 206431 (C.D. Cal. April 26, 1989).

**ANSWER:** Defendant denies the allegations in Paragraph 64.

65.     Counsel for Defendant responded on May 1, 2023, stating that "[n]either your mischaracterizations of my client's statements about his desire to have the book accepted by the Tolkien Estate as related to The Lord of the Rings, nor my client's use of characters or ideas from that series invalidate his copyright" and that the Infringing Work is "an original story created from unprotectable ideas."

**ANSWER:** Defendant admits the allegations in paragraph 65.

66.     Defendant's inexplicable refusal to cease sales of his clearly infringing Work; his unreasonable delay tactics; and his filing of a baseless and wasteful lawsuit, make clear that Defendant has no intention of ceasing his willful, egregiously infringing

**ANSWER TO PLAINTIFFS' COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

behavior. Plaintiffs therefore bring this lawsuit seeking injunctive relief and damages they have suffered as a result of Defendant's activities.

**ANSWER:** Defendant denies the allegations in Paragraph 66.

## <u>CLAIM FOR RELEIF</u>

67.    Plaintiffs re-allege each and every allegation set forth in Paragraphs 1 through 66, inclusive, and incorporate them by reference.

**ANSWER:** Paragraph 67 is not an allegation which requires a response and so Defendant denies same.

68.    Plaintiffs are currently and at all relevant times the sole proprietor of all right, title and interest in and to the copyrights in and to the works in the Tolkien Canon, including the Tolkien Trilogy, all of which are original works originally authored by Professor                                   J.R.R.                                   Tolkien.

**ANSWER:**  Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 68, and therefore denies the same.

69.    Under 17 U.S.C. § 106, Plaintiffs own the exclusive rights to reproduce the works in the Tolkien Canon, including the Tolkien Trilogy, to distribute copies of those works to the public, to publicly perform and display those works, and to make, or authorize third parties to make, derivative works based on those works.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 69, and therefore denies the same.

70.    Plaintiffs also hold a copyright interest in certain of the characters portrayed in the Tolkien Canon, including the Tolkien Trilogy.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 70, and therefore denies the same.

71.    Plaintiffs have never authorized Defendant to reproduce, distribute, perform, or display all or any part of the Tolkien Canon, including the Tolkien Trilogy, or to make derivative works therefrom.

**ANSWER:** Defendant admits the allegations in paragraph 71.

**ANSWER TO PLAINTIFFS' COMPLAINT**

72.    It is indisputable that Defendant had direct access to the Tolkien Canon, including the Tolkien Trilogy, as an admitted superfan of Professor Tolkien's oeuvre who has read the Tolkien Trilogy until the book's "spines gave out" and has conceded that he has adhered to canon as closely as possible.

**ANSWER:** Defendant admits the allegations in paragraph 72.

73.    The Infringing Work is a self-described "sequel" to the Tolkien Trilogy that includes verbatim copying of substantial passages, as well as duplication of plot, themes, structure, dialogue, mood, settings, pace, characters, and sequences of events from Professor Tolkien's original works.  In particular, the Infringing Work copies multiple original, unique and delineated characters that Defendant lifts lock, stock and barrel from the Tolkien Trilogy (retaining the names, histories, relationships, physical descriptions, conceptual attributes, and personal experiences of these characters as set forth in the original works), places these characters into the exact same fictional locations originally created by Professor Tolkien, and sets such characters into motion along similar narrative journeys as in the original works.  This constitutes wholesale misappropriation of significant elements of Professor Tolkien's creative expression and highly developed, copyright-protected characters, including (but in no way limited to) Samwise and Rosie Gamgee, Goldberry, Tom Bombadil, Aragorn, Arwen, Legolas, Gimli, Elessar, Galadriel, Barliman Butterbur, Elrond, Sauron, and many, many other inhabitants of Professor Tolkien's vast creative universe.

**ANSWER:** Defendant denies the allegations made in Paragraph 73.

74.    By his own admission, both publicly and in correspondence with the Tolkien Estate, Defendant knowingly created an unauthorized sequel that appropriates significant elements of protected expression from the Tolkien Canon, including in particular the Tolkien Trilogy, and is currently capitalizing on the popularity of that expression by continuing to offer his Infringing Work for sale on multiple platforms.

**ANSWER:** Defendant denies the allegations made in Paragraph 74.

ANSWER TO PLAINTIFFS' COMPLAINT

75.     By his actions above, Defendant has willfully infringed and will continue to infringe Plaintiffs copyright in and to the Tolkien Trilogy. Plaintiffs hold the exclusive right to create, or authorize others to create, derivative works based on the Tolkien Trilogy. They have not authorized Defendant to create the Infringing Work, which he has admitted is a sequel and which is explicitly based on and derived directly from the Tolkien Trilogy by placing Tolkien's copyrighted characters and other protected elements into the fictional world of Middle-earth. Further, he has invoked the Tolkien Trilogy in the titles and in marketing the Infringing Work as a sequel, for the purposes of capitalizing – for a sale price of $17.99 to $26.99 per copy – on Plaintiffs' existing intellectual property with a built-in fanbase.

**ANSWER:** Defendant denies the allegations made in Paragraph 75.

76.     Plaintiffs are entitled to an injunction restraining Defendant, his agents and employees, and all persons acting in concert or participation with him, from engaging in any further such acts in violation of the Copyright Act.

**ANSWER:** Defendant denies the allegations made in Paragraph 76.

77.     Plaintiffs are further entitled to recover from Defendant the damages, including attorneys' fees, they have sustained and will sustain, and any gains, profits and advantages obtained by Defendant as a result of his acts of infringement as alleged above. At present, the amount of such damages, gains, profits and advantages cannot be fully ascertained by Plaintiffs, but will be established according to proof at trial. Plaintiffs are also entitled to recover, in the alternative, statutory damages for Defendant's willful infringement of their intellectual property.

**ANSWER:** Defendant denies the allegations made in Paragraph 77.

## **AFFIRMATIVE DEFENSES**

1.     Defendant has a valid copyright on his work, TXu 2-076-068.

2.     Plaintiffs have unclean hands and their claims are retaliatory in nature.

**ANSWER TO PLAINTIFFS' COMPLAINT**

32

3.      Plaintiffs' claims for relief are barred by the Fair Use Doctrine pursuant to Section 107 of the Copyright Act, 17 U.S.C. §107.

4.      Plaintiffs' action is barred by the doctrine of laches.

5.      Defendant's conduct was innocent, non-infringing, and not a willful infringement of copyright.

6.      Plaintiffs' claims are barred by the statute of limitations.


WHEREFORE, Defendant requests that:

1.      Plaintiffs take nothing by this action; and

2.      Answering Defendant be awarded any other and further relief as the court deems just and proper.


Dated: August 31, 2023                    Respectfully submitted,

                                          Katie Charleston Law, PC


                                          By:    /s/ *Katie Charleston*
                                                 Katie Charleston, Esq.
                                                 Attorney for Defendant

**ANSWER TO PLAINTIFFS' COMPLAINT**